## Cyrus M. Bruce v. Major Hawley.

*Promissory notes and bills of exchange. Banks.*

Negotiable paper, not payable upon its face or by direct indorsment to a bank, is subject to the provisions of sec. 82 of chap. 84 of the Compiled Statutes,* only while it is held by the bank.

The fact that one is a director of an insolvent bank, does not render it illegal for him to receive in good faith from the bank a transfer of negotiable paper against third persons, held by the bank, in payment of a debt due and payable from the bank to him; and if he so receive negotiable paper, before maturity, not payable on its face to the bank, he may collect it of those liable upon it in his own name, and they have no right to pay it in the bills of the bank.

Even if the receipt of such paper, under such circumstances, be a breach of his duty to the bank, that constitutes no ground of defence for the person liable upon the paper, so long as the stockholders of the bank do not complain of it.

---

* Which is as follows: " all the bills and notes of such bank shall be deemed to be payable at such bank, and shall at all times be received by said bank on all judgments, executions or demands, made payable to, or the property of the bank." Comp. Stat. 494.

ASSUMPSIT upon a bill of exchange drawn by the defendant on Ira Cochrane, payable to the defendant's order, indorsed by him and accepted by Cochrane.

Plea, the general issue, and trial by jury, at the June Term, 1858,—ALDIS, J. presiding.

The plaintiff proved the execution and delivery of the bill of exchange, its transfer to the plaintiff on the 4th of September, 1857, before maturity, and a presentment, protest and notice in due form, and rested his case.

The defendant offered testimony tending to show that before the bill was drawn, Ira Cochrane (the acceptor) made an arrangement with the Danby Bank for a loan to him to the amount of this bill of exchange; that at the request of the bank the paper offered by Cochrane for discount was to be, and was accordingly drawn by the defendant upon Cochrane, payable to the order of the defendant, and accepted by Cochrane, and indorsed by the defendant; that the plaintiff, as one of the directors of the bank, was cognizant of this arrangement between Cochrane and the bank; that this bill of exchange was made and discounted pursuant to such arrangement; and that the plaintiff as one of the directors assented to its discount; that the plaintiff was a director of the bank from January 1, 1857, until the bank failed; that the plaintiff was the operator of the telegraph at Danby, and on the 4th day of September, 1857, received from the cashier of the Suffolk Bank, Boston, this dispatch for the Danby Bank: "Hitchcock on Allen & Co., N. Y. for $10.000 is protested; can you do anything; $20.000 behind; must stop;" that he took the dispatch to the bank and consulted with the cashier about the matter; that the cashier said there must be a mistake about it, and that it could not be possible their account at the Suffolk Bank was so much overdrawn, and he gave the plaintiff a dispatch in reply to send to the Suffolk Bank, as follows: "Dispatch received—the protest you have must be a mistake—think can make good at once;" that on the same day the cashier of the Danby Bank received the following dispatch from Hitchcock, whose draft had been protested, and who was the chief owner of the stock of the Danby Bank, and was also a very large debtor to it: "Telegraph Suffolk to keep steady, and we can and will take care of 'em—but if thrown

out would cripple by rendering currency unsaleable — will work as fast as possible;" whereupon the cashier on the same day sent this dispatch to the Suffolk Bank: "Please hold on—have positive assurance you can and shall be taken care of;" that the bank at this time was in fact insolvent, but that the plaintiff and the other directors were not aware of its condition, or of the real insolvency of Hitchcock, its principal debtor, and supposed and believed that their trouble would be but temporary, and that they would be able to go on in business; that the plaintiff on the 4th of September, had a deposit of about one thousand dollars in the bank, and after receiving the dispatch from Boston, and communicating it to the cashier, the plaintiff said to the cashier that he should want the balance of his deposit account to take to New York in a few days; that if the bank should stop it might trouble him to get his money to go to New York with, and therefore that he wished then to draw out the amount of his deposit; that the cashier requested him to take the bill of exchange in question, instead of the specie, as he wished to keep all his money to meet any demands that might be made on the bank, if there should be a run on it; that the plaintiff at first objected, but finally consented to do so, and drew his check for the amount, and the cashier transferred to him this bill of exchange; that the cashier stated to the plaintiff that the defendant's name made the bill of exchange amply good, and that it would be paid in a few days; that the plaintiff's check was charged to him on the books of the bank, and that this transaction was stated to the directors on the 6th or 7th of September, and before the failure of the bank, and was approved by them, though no vote of approval was passed; that at the time the bill of exchange was transferred to the plaintiff, the plaintiff and the other directors expected the difficulties of the bank would be but temporary, and that it would be able in a few days to take back this bill and give the plaintiff his money; and that in fact the amount of the bill exceeded by a small sum the balance due the plaintiff on deposit; but that nothing was said as to the bank's taking back the bill.

John H. Vail, a witness in the case, called by the defendant, on cross-examination, testified as follows: "We had in specie at the bank on the 2d of September, three thousand six hundred

and five dollars, and I have no recollection of paying out any till Bruce called on me to pay him the balance due him on deposit. I asked him to take the bill of exchange instead of the money; he at first declined, but finally consented. I should have paid him the money if I could not have got him to take the paper."

It further appeared that the bank failed to redeem its bills at the Suffolk Bank, Boston, on the 4th of September, 1857, and ceased to redeem its bills at its own counter on the 7th of September, 1857, at half past ten A. M.

It also appeared that the defendant on the 11th of June, 1858, tendered to the plaintiff Danby Bank bills sufficient to pay the bill of exchange, and specie enough to cover the costs in this suit; and the same were paid into court. It also appeared that the plaintiff notified Cochrane (the acceptor) of the transfer of the bill before the bank stopped redeeming at its own counter.

The defendant insisted, and requested the court so to charge the jury, that if the bill in question was discounted at the Danby Bank, either with or without a previous arrangement between the directors of the bank and Cochrane for the loan, the bill became the property of, and, by the indorsement of the defendant, was made payable to, the bank, within the provisions of chapter 84 section 82 of the Compiled Statutes, and that the bank could not so negotiate it as to deprive the defendant of the right to pay the same in the bills of the Danby Bank; that if the bank could so legally transfer the bill while current, still, if the plaintiff was a director of the bank, and the transfer was made to him after the bank became insolvent, or if it was delivered to him as a security for the payment of an indebtedness due him from the bank, the plaintiff could not recover; and that if while the plaintiff was a director of the bank, an arrangement was made with the bank by Cochrane for the loan, and that the paper to be discounted should be in the form of the bill in question, the right of the defendant to pay it in Danby Bank bills was the same as though the paper had been a joint and several note of the defendant and Cochrane, payable directly to the bank.

The court declined to charge the jury as requested, but charged them:

1. That this bill of exchange was not *payable to* the bank

within the provisions of section 82 of chapter 84 of the Compiled Statutes, although discounted by the bank pursuant to the arrangement alleged by the defendant to have been made between Cochrane and the directors of the bank.

2. That if the bill of exchange was transferred by the bank to the plaintiff, not as collateral security to the plaintiff for the debt due him from the bank, but to be his absolutely, then the plaintiff could recover the amount of the bill of exchange.

3. That if the bill of exchange was transferred by the bank to the plaintiff, not absolutely, but only as a security for the debt due him from the bank, then the plaintiff would be entitled to recover, not the amount of the bill, but the amount of the debt which the bill was transferred to the plaintiff to secure (it being admitted that such debt was less than the amount of the bill).

4. That the fact that the plaintiff was a director of the bank from January 1, 1857, till after the failure of the bank, did not deprive him of the right to take a transfer of this bill from the bank, in order to secure to him a debt justly due him from the bank, although the bank was actually insolvent at the time of such transfer.

Under these instructions the court ordered a verdict for the plaintiff, the amount of the verdict by the consent of both parties being fixed at the amount of the debt from the bank to the plaintiff, which the transfer of the bill of exchange was intended (as claimed by the defendant) to secure.

To the refusal of the court to charge as requested, and to the charge as above detailed, the defendant excepted.

*A. L. Miner, E. B. Burton* and *H. Canfield,* for the defendant.

1. The defendant insists that, as the bill in suit was drawn for the express purpose of being discounted under an agreement with the bank and the plaintiff, having been so discounted it became both the property of the bank and payable to the bank, within the meaning of chap. 84, sec. 82, Comp. Stat., and the same could be paid in notes issued by the bank. Such was the law till the statutes were revised; Slade's Comp. 103 sec. 1 and 4. The spirit of these sections was intended to be retained by the legislature in the 82d sec., notwithstanding the old statute was repealed.

2. The plaintiff was a director in the bank, and made the arrangement with Cochrane. He can have no greater or different rights than the bank would have had if the suit had been in the name of the bank.

The plaintiff was a director in the bank, and was acting in a fiduciary capacity. He was agent or trustee of the stockholders, and could not make a valid purchase of the notes or bills due the bank. 1st, he had to purchase of himself, if at all; 2d, a director could not purchase if the bank had power to sell; *Cumberland Coal Co.* v. *Sherman et al.*, decided by Justice DAVIES, of the New York Supreme Court; see New York Daily Times, February 3d, 1859, and cases there cited.

4. The bank was *insolvent*. This the plaintiff knew, or should have known, being a director. His taking this bill and requiring it to be paid in current funds to himself, was a direct fraud upon the defendant, and all the bill holders of said bank.

5. The plaintiff did not take the bill in suit " in the due course of trade." He parted with no new consideration for it. It was received on a pre-existing debt, as *collateral* security. The defendant can make any defence he could have made against the bank, even if the plaintiff had no connection with the bank; *Coddington* v. *Bay*, 20 Johns. 651; *Payne* v. *Cutter*, 13 Wend. 605; *Rose* v. *Brotherston* 10 Wend. 85; *Russell* v. *Buck*, 14 Vt. 157.

*E. Edgerton* and *Roberts & Chittenden*, for the plaintiff.

I. The fact that the plaintiff was a director of the bank, and that the bank was actually insolvent at the time of the transfer, can have no bearing, except upon the possible question of actual fraud, which is not raised. The plaintiff was none the less a creditor of the bank and entitled to payment, because he was a director.

II. The point made by the defendant, that no recovery could be had if the bill was received as a security for the debt, was not well taken.

1. The evidence did not tend to prove the point made, but that the plaintiff's claim was satisfied by the transaction.

2. This can not be said to be a transaction wanting consideration, as being collateral to an existing debt, the debt still remain-

ing, and so the plaintiff losing nothing by taking the bill. To such objection it might be answered : first, it is begging the question to insist that the old debt remained; secondly, something was lost or forborne by the reception of the bill, viz: present payment in specie, and the possibility of collecting the debt of the bank on account of its actual failure while the plaintiff held the bill; thirdly, no new liability of the bank was created by the transfer, as a substitute for the original indebtedness, for the bank did not indorse the bill; *Bank of St. Albans* v. *Gilliland*, 23 Wend. 311.

It follows that the third ruling of the court below, whether abstractly accurate or not, was harmless, since it was rather an abstraction than based upon any evidence that the bill was received as collateral.

III. This bill was not "made payable to the bank." Originally it was made payable to the defendant. It was indorsed by him in blank, and so not thereby *made* payable to the bank more than to any other person.

The question is one of literal rather than of equitable construction.

1. So far as public policy bears upon the question, it is against the construction claimed. The customs and necessities of banks require that they should have a class of paper and securities which they can negotiate, and raise money upon; that they should both buy and sell bills of exchange.

2. The parties had their election to make their paper payable to the bank or not; in other words, to make it subject in whosesoever hands it might fall, to this defence. If they omitted to indicate upon the paper any restraint upon its negotiability, or to impose upon it any infirmity which they might have imposed, there is no occasion for complaint on their part; *Austin* v. *Birchard*, in Addison County, January Term, 1859.

IV. This bill was once the property of the bank. While it so remained it was subject to payment in the bills of the bank. When the bank ceased to own the bill the statute ceased to operate upon it, as the defendant was no longer a debtor of the bank.

The language of the statute excludes the construction claimed

by the defendant. The bills, etc., "shall at all times be received by *said bank*, etc.;" not by the assignee of the paper.

PIERPOINT, J. This action is brought upon a bill of exchange drawn by the defendant on Ira Cochrane, payable to his own order, indorsed by him and accepted by Cochrane, and in that form discounted by the Danby Bank, for the benefit of Cochrane. Before this paper became due the cashier of the bank transferred it to the plaintiff, in payment of his deposit account with said bank, and the plaintiff took this bill in lieu of the specie, which he would have received if he had not accepted the bill.

It is insisted on the part of the defendant, that the court erred in charging the jury that this bill of exchange was not payable to the bank, within the provisions of section 82 chapter 84 of the Compiled Statutes.

The language of this section is that " all the bills and notes of such bank shall be deemed to be payable at such bank, and shall at all times be received *by said bank*, on all judgments, executions or demands, *made payable to*, or the property of, such bank."

To bring this paper within the provisions of the statute, it must appear that it was either made payable to, or was the property of, the bank. In passing upon this question, we will treat the plaintiff as the *bona fide* holder and owner of this paper, and as standing in the same position as though he had, at the time he took the bill of exchange, no other connection with the bank than as the purchaser of this paper.

Was this paper, either on its face or by reason of anything that had been done with it, or on the faith of it, so made payable to the bank as to come within the provisions of the statute? The paper on its face was payable to the defendant's order. When the defendant indorsed the paper in blank, that did not make the paper payable to the bank, but only placed it in that condition that it would, by operation of law, become payable to any person who should see fit to advance his money upon it, and become the holder. When the bank advanced the money and took this paper, it became payable to the bank, not because it was indorsed to the bank in terms, but because, being indorsed in blank, it thus

became payable to the holder, and this peculiarity of its condition remains. It is still payable to the holder, and to the bank only as the holder, and while it continues to be the holder.

When the bank transferred this paper to the plaintiff in good faith, as we are now supposing, what became its condition in his hands? and were the rights and liabilities of the parties to it changed by its having passed through the hands of the bank? While the paper was in the hands of the bank it was by virtue of the statute payable in the bills of the bank, and if sued by the bank, it would by the general law be subject to offset, or to any other defence that might exist as between this defendant and the bank, but this is solely because the bank is the owner and holder of the paper. Upon the transfer of the paper to the plaintiff, the right to pay it in the bills of the bank is terminated. That right attached to the paper by virtue of the statute, only while the bank was the owner of it. The plaintiff holds the paper in this case as he would have held it if it had been transferred to him in the first instance; he may fill up the defendant's indorsement directly to himself, and hold the paper as though the defendant had so indorsed it to him.

We think that all the legislature intended was to put it in the power of the parties in making their paper, to subject it to this right as to its payment, by making it payable to the bank. The words "made payable to," when used in connection with this class of paper, are universally understood to refer to the person in whose favor the paper is drawn, upon its face, and we think the legislature must have so understood it. To put any other construction upon it, would attach a clog to negotiable paper that would naturally impede its circulation, a result that legislatures and courts have for many years sought to avoid. No person, on having a paper like the one before us presented to him, could tell whether or not it had passed through some bank, and thereby acquired a latent property or condition that rendered it comparatively valueless.

It is insisted that public policy requires that the court should place a liberal construction upon this section of the statute, in favor of restraining the transfer of paper of this character by our banks. We do not so regard it. One of the first objects of

legislation on the subject of banks, in this State, was the safety
of the bill holders, and to this end the most important thing (after
the actual solvency of the bank) is, that the banks should keep
up their redemptions at their counter and in market.   If they fail
to do this, their bills are at once at a discount, and the bill
holders suffer, whether the bank is solvent or not.   It is a fact
of general notoriety that the most efficient means that our banks
can avail themselves of to keep up their redemptions in market,
are derived through their dealings in drafts and bills of exchange.
It is upon these mainly that they rely to furnish themselves with
funds in market with which to redeem their bills.   Such being the
case, it can easily be conceived that in the constant fluctuations
in the money market, and in the periods of panic, that so fre-
quently occur in the business world, banks that are perfectly sol-
vent may find it necessary to anticipate the money on this class
of paper, in order to keep up their redemptions, and protect the
bill holders ; for it is upon the bill holder in such cases that the
injury falls.   And it is for these reasons, doubtless, that in many
of the restrictions upon the operations of banks, that are found
in our statutes, exceptions are made in favor of this class of paper.

But it is claimed that the position that the plaintiff occupied
as a director of this bank, was such that he could not take this
bill in payment of, or as a security for, his debt against the bank.

It is not claimed that the plaintiff in accepting this bill, or the
cashier in transferring it to him, acted with any fraudulent intent.

The testimony went to show that this bill was taken in lieu of
specie, and that the object of the plaintiff and the cashier was to
avoid reducing the specie of the bank, and thus embarassing it,
and that they both then believed that their troubles would be but
temporary.   It was, in short, only anticipating the money on this
draft, to pay the debt that the bank owed the plaintiff.   If the
cashier had paid the plaintiff his deposit in specie, no objection
could have been taken to it.   We think it equally competent for
the cashier to pay in the manner he did, if the plaintiff was wil-
ling to accept it.   And to do so could not operate to the prejudice
of the bank or its creditors, or to the injury of the defendant.
Its effect may be to prevent the defendant from cancelling the
debt by paying a mere fraction of it, but it can not be said to do

---

Corlies & Co. *v.* Estes.

---

him an injury, so long as he is not required to pay any more than he honestly can upon it. The fact that the plaintiff was a director of the bank, we think can make no difference with his right to receive this bill in payment of his debt. And even if this should be regarded as a breach of his duty to the bank, that is a matter of which this defendant can not avail himself, so long as the stockholders do not complain of it.

The ruling of the court, as to the effect of this bill having been taken as collateral security for his debt, is one that, if erroneous, this defendant could not object to, as its effect would be merely to reduce the amount of damages.

The judgment of the county court is affirmed.